

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-11-2008

# LaSala v. Bordier et Cie

Precedential or Non-Precedential: Precedential

Docket No. 06-4323

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"LaSala v. Bordier et Cie" (2008). *2008 Decisions.* Paper 1350.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1350

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-4323
_____

JOSEPH P. LASALA and FRED S. ZEIDMAN,
as CO-TRUSTEES
of the AREMISSOFT LIQUIDATING TRUST

Appellants

v.

BORDIER ET CIE and DOMINICK COMPANY, A.G.

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 05-4520)
Honorable Joel A. Pisano, District Judge

_____

Argued December 13, 2007

BEFORE: SLOVITER and AMBRO, *Circuit Judges*,
and POLLAK,[*] *District Judge*

Filed: March 11, 2008
_____

Hal M. Hirsch, Esq.
Greenberg Taurig, LLP
200 Park Avenue

---

[*] Honorable Louis H. Pollak, Senior District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

Met Life Building
New York, NY 1066

Gary R. Greenberg, Esq. (Argued)
Louis J. Scerra, Jr., Esq.
Peter M. Casey, Esq.
Greenberg Taurig, LLP
One Internaional Place
Boston, MA 02110

     *Attorneys for Appellants Joseph P. LaSala and Fred S. Zeidman*

Elliot Cohen, Esq. (Argued)
Troutman Sanders, LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174

     *Attorney for Appellee Bordier et Cie*

Paul J. Bschorr, Esq. (Argued)
Lawrence J. Reina, Esq.
Casey D. Laffey, Esq.
Reed Smith, LLP
599 Lexington Avenue
New York, NY 10022

Anthony J. Laura, Esq.
John J. Zefutie, Esq.
Reed Smith, LLP
136 Main Street, Suite 250
Princeton, NJ 08540

Charles J. Becker
Reed Smith, LLP
2500 One Liberty Place
1650 Market Street
Philadelphia, PA 19103

     *Attorneys for Appellee Dominick Company, A.G.*

OPINION OF THE COURT

POLLAK, *District Judge*

In this appeal, we are called upon to decide whether state-law aiding-and-abetting-breach-of-fiduciary duty claims, which have passed from a corporation to its bankruptcy estate to a trust, may be brought in federal court by the trustees of the trust notwithstanding the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 78bb. We must further decide whether, under SLUSA, the trustees, as assignees of individual investors in the bankrupt enterprise, may assert, in federal court, against foreign entities, claims characterized as arising under foreign law for aiding and abetting money laundering. For the reasons that follow, we hold that SLUSA is no impediment to federal adjudication of either the state-law or the foreign-law claims.

## I. Facts and procedural history

The story begins with AremisSoft, which (prior to its demise) was a software enterprise incorporated under the laws of Delaware. Between 1998 and 2001, two of AremisSoft's directors and officers, Lycourgos Kyprianou and Roys Poyiadjis (collectively, the "Directors"), allegedly executed a classic "pump-and-dump" scheme. According to the complaint, they artificially inflated AremisSoft's stock price by representing that its financial position was far stronger than it really was. Having "pumped" the stock price, they "dumped" the AremisSoft stock they had accumulated by selling their shares on the open market to unsuspecting investors. To cover their tracks, the Directors allegedly ran these insider-trading transactions through a variety of sham entities and bank accounts, all, so the complaint alleged, with the assistance and knowledge of defendants Bordier et Cie and Dominick Company (collectively, the "Banks"), both banking institutions organized under the laws of Switzerland. A few months and some hundreds of millions of dollars later,

3

AremisSoft's real financial status was discovered, and its stock price plummeted. AremisSoft's condition deteriorated to the point that NASDAQ halted trading of its common stock in July 2001.

The situation continued to worsen and, in March 2002, AremisSoft petitioned for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of New Jersey. At the time of the bankruptcy petition, a federal class-action securities suit, in which a group of purchasers of AremisSoft stock (the "Purchasers") requested rescission of their stock-purchase contracts, was pending against AremisSoft. To settle the Purchasers' suit, the parties to the bankruptcy proceeding agreed that the plan of reorganization would assign to the Purchasers all causes of action owned by AremisSoft. An agreement of this sort would not seem to be either uncommon or problematic. While many corporations become insolvent for reasons that do not render anyone legally at fault, it is also not unusual for a bankrupt corporation to have viable legal claims against parties that wrongfully contributed to its demise. These claims can take myriad forms, from breach-of-contract claims against suppliers or customers, to tort claims against those who injured the corporation's property or economic interests, to, as here, claims for disloyalty against corporate fiduciaries and those who, so it is alleged, aided them. In bankruptcy—a process that seeks to gather and preserve all of the debtor's assets, and distribute them to creditors and interest holders in an orderly fashion—legal claims that belonged to the debtor are often important assets of the bankruptcy estate, and are fair game for distribution to the debtor's creditors and equity holders.

In the case at bar, rather than trying to assign to each of the Purchasers some portion of the estate's claims, the plan of reorganization provided for the creation of a state-law trust (the "Trust") to take title to and prosecute the assigned claims for the Purchasers' benefit. The Purchasers also assigned to the Trust any causes of action that they owned individually for activities related to the purchase of the AremisSoft securities. Assigning both sets of claims (the debtor corporation's claims and individual Purchasers' claims) to the Trust made logistical sense, as it rendered one entity responsible for prosecuting and

4

distributing to the Purchasers the proceeds of all of the claims.[1]

In bringing this lawsuit in the District Court for the District of New Jersey, plaintiffs Joseph LaSala and Fred Ziedman, trustees of the Trust, asserted four causes of action: two counts of aiding and abetting a breach of fiduciary duty, one against Bordier (Count I), and one against Dominick (Count II); and two counts of violating Swiss money-laundering laws, one against Bordier (Count III), and one againt Dominick (Count IV). All causes of action were allegedly assigned to the Trust by the AremisSoft bankruptcy estate or by the Purchasers in their individual capacities.

## II. SLUSA and the District Court's decision

The Banks filed a motion to dismiss, arguing, *inter alia*, that the Trust's lawsuit was preempted[2] by SLUSA. Congress

---

[1] The parties have spent a great deal of (perhaps not altogether productive) energy fighting over whether the Trust is a "litigation trust" or a "liquidating trust." Litigation trusts are common in securities and bankruptcy litigation: they exist as vehicles for maintaining suits for the benefit of, and distributing proceeds to, large numbers of people. Liquidating trusts are common in bankruptcy as successor entities to Chapter 11 debtors, and are often tasked with the responsibility of liquidating and distributing the assets that remain after confirmation of the plan of reorganization. These are not formal terms of art, and they do not have hard and fast definitions.

Here, the Trust is a hybrid. It is like a litigation trust inasmuch as it was assigned a variety of individual claims by the Purchasers and was tasked with litigating them; it is also like a liquidating trust inasmuch as it took title to many of the remaining assets of the bankruptcy estate (including the estate's causes of action) and was tasked with liquidating and distributing them. The hybrid nature of the Trust, far from being suspect, may be seen as a gratifying testament to the flexibility and creative license that Chapter 11 accords parties in fashioning plans of reorganization.

[2] For ease and consistency with other cases, we refer throughout this opinion to SLUSA "preemption." In so doing, we

5

enacted SLUSA in 1998 as a supplement to the Private Securities Litigation Reform Act ("PSLRA") of 1995, 15 U.S.C. § 77z-1 & 78u-4, so, to understand SLUSA, one must first understand the PSLRA. Congress enacted the PSLRA because it determined that securities plaintiffs and their attorneys were bringing abusive securities class actions that had no legitimate chance of success, but, because of the expense of discovery, were enough of a nuisance to force defendants to settle non-meritorious claims. S. Rep. No. 104-98, at 9, 1995 U.S.S.C.A.N. 679, 688. Moreover, class members typically recovered very little from those settlements, while class counsel were paid exorbitant fees. *Id.* at 6, 685. The PSLRA imposed on securities plaintiffs a number of requirements designed to deter the filing of these "strike suits" and to enable district courts more easily to dismiss frivolous suits on the pleadings. *Id.* at 35, 714. In response, plaintiffs began abandoning the federal courts altogether and bringing suit under state securities laws that did not impose these additional requirements. S. Rep. No. 105-182, at 3–6 (1998).

SLUSA undertook to close this perceived loophole by preventing securities plaintiffs from using the class-action vehicle to prosecute state-law securities claims. To be preempted by SLUSA an action must (1) make use of a procedural vehicle akin to a class action,[3] and (2) allege a

---

caution that SLUSA does not actually "preempt" causes of action, so much as it prevents causes of action from being asserted through the vehicle of a class action lawsuit. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 87 (2006) ("SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist.").

[3] SLUSA defines an affected "covered class action" as:

(i) any single lawsuit in which--
    (I) damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact

6

misrepresentation or deceptive device in connection with a securities trade.[4]  15 U.S.C. § 78bb(f)(1).  The class-action ingredient is designed to distinguish between mass actions[5] and

common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members; or

(II) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or fact common to those persons or members of the prospective class predominate over any questions affecting only individual persons or members; or

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which--

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. § 78bb(f)(5)(B).

---

[4] Under SLUSA, a lawsuit contains the securities-trade ingredient if the plaintiff alleges:

(A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or

(B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).

[5] By "mass actions" we mean  actions that operate like class actions, inasmuch as they seek to impose liability on a defendant for injuries to many people arising out of a common set of facts, but are not necessarily brought pursuant to Federal Rule of Civil Procedure 23 or one of its state-law equivalents.

individual actions.  S. Rep. No. 105-182, at 7–8.  The securities-trade ingredient is designed to distinguish between state-law-based suits that, no matter how pleaded, in essence allege securities fraud, and those that allege other wrongs.  *See Rowinski v. Salomon Smith Barney, Inc.*, 298 F.3d 294, 299–300 (3d Cir. 2005).  When a claim contains both the class-action and the securities-trade ingredients, it must be dismissed.[6]  15 U.S.C. § 78bb(f)(1).  A plaintiff may pursue such a claim either (1) as a federal securities fraud class action, or (2) as a state-law individual action; she may not pursue such a claim as a state-law class action.

In the case at bar, the District Court ruled that all four claims were preempted by SLUSA, and thus dismissed the action.  The court determined that all of the counts involved substantive allegations of misrepresentations in connection with securities trades.  It further concluded that the lawsuit operated like a class action, inasmuch as the Trust was asserting claims for the benefit of some 6000 former shareholders of AremisSoft.  The Trust now appeals that dismissal.[7]

## III.    Counts I & II — Aiding and abetting breaches of fiduciary duty

### A.    Clarifying the claims pleaded

In their briefs and at oral argument, the parties have largely talked past one another.  This is somewhat

---

[6] SLUSA reaches "covered class actions" brought in state court by making such claims subject to removal to federal court, 15 U.S.C. § 78bb(f)(2), where they are then subject to dismissal, 15 U.S.C. § 78bb(f)(1).

Whether a single offending claim requires dismissal of the entire action is an open question, and one we need not reach here.  Another open question is whether any dismissal should be without prejudice to the reassertion of the claims in individual actions.

[7] We have jurisdiction under 28 U.S.C. § 1291.  SLUSA preemption is jurisdictional, and we review dismissals for lack of subject-matter jurisdiction *de novo*.  *Rowinski*, 398 F.3d at 298.

understandable, as the parties differ in their definition of the nature of the claims at issue. Therefore, we begin by making clear what claims are asserted by the Trust, and how the Trust became the owner of those claims.

Much of the confusion stems from the fact that the nature of a pump-and-dump scheme perpetrated by corporate directors and officers is that it typically gives rise to multiple viable causes of action—causes of action that are owned by different parties and are assertable against different defendants. For example, for the offending directors and officers, carrying out a pump-and-dump scheme almost certainly constitutes a breach of their duty of loyalty to the corporation they serve. Thus, the scheme gives the corporation a colorable claim against the directors and officers (and anyone who knowingly aided them) for breach of fiduciary duty (and aiding and abetting a breach of fiduciary duty).[8] The remedy for such a breach, under Delaware law, is that the directors and officers and their abettors become jointly and severally liable to make good on any loss to the corporation attributable to the disloyalty. *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) (affirming Chancellor's decision to hold abettors of

---

[8] Delaware law has long provided that corporate fiduciaries who engage in insider trading for personal gain breach the duty of loyalty. *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 8 (Del. Ch. 1949) (Harrington, C.). There is some dispute over whether *Brophy* is still good law to the extent that it imposed the remedy of disgorgement of the trader's profits, rather than limiting the corporation's recovery to actual damages, but there is no dispute that insider trading constitutes a breach of duty. *See In re Oracle Corp.*, 867 A.2d 904, 928 n.111 (Del. Ch. 2004) (Strine, V.C.) ("Notably, the abolition of *Brophy* would not preclude a recovery by the corporation for *actual* harm to itself caused by illicit insider trading by a fiduciary, but the existence and extent of such damage would have to be proven." (emphasis in original)), *aff'd*, 872 A.2d 960 (Del. 2005) (table). As the Vice Chancellor noted, *Brophy* has not been overruled, and, as the Vice Chancellor also noted, the American Law Institute maintains that *Brophy*'s provision of the disgorgement remedy is the best approach to corporate-governance law. 867 A.2d at 929 n.112.

fiduciary breach jointly and severally liable for the damage caused by the breach). If the corporation wrongfully refuses to pursue these claims, its shareholders may bring them derivatively.[9] *See In re First Interstate Bancorp Cons. S'holder Litig.*, 729 A.2d 851, 864 (Del. Ch. 1998) (holding that, where alleged breach of fiduciary duty harmed the corporation, alleged aiding-and-abetting claim is derivative in nature).

For another relevant example, a pump-and-dump scheme likely gives rise to a colorable suit by the purchasers of the "pumped" securities against the directors and officers under federal securities laws for rescission of their purchases or damages in the amount of the difference between what they paid for the pumped securities and what those securities were really worth.[10] A similar suit could also be maintained under federal securities law against the corporation if the corporation had made any material misrepresentations as to its financial condition,[11] which is often a part of these schemes. What tends to make the present case appear somewhat confusing is that both of these types of claims—securities claims owned by the

_____

[9] Delaware law generally does not allow shareholders to assert breach-of-fiduciary-duty claims directly, unless the shareholders can show damage distinct from the damage to the corporation. *Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031, 1034 (Del. 2004) (Veasey, C.J.). As the *Tooley* Court noted, for a direct claim to lie,

> [t]he stockholder's claimed direct injury must be independent of any alleged injury to the corporation. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation*.

*Id*. at 1039 (emphasis added).

[10] Section 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*, and section 29 of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78cc, provide these remedies.

[11] This remedy is available under Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated to enforce § 10(b) of the 1934 Act, 15 U.S.C. § 78j.

Purchasers and fiduciary-duty claims owned by the corporation—were assigned to the Trust.

Counts I and II of the complaint plead claims against the Banks for aiding and abetting the Directors' breaches of their fiduciary duty (presumably, the duty of loyalty) to AremisSoft and its shareholders. While we are not at this time deciding whether these claims are adequately pleaded, one can only understand the allegations in light of the elements of the pleaded cause of action. Under Delaware law, aiding and abetting a breach of fiduciary duty has three elements: (1) a breach of fiduciary duty, (2) knowing participation in that breach by the defendant, and (3) damages. Here, ¶¶ 109 and 114 of the complaint undertake[12] to allege breaches by the Directors, ¶¶ 110–11 and 115–16 undertake to allege participation by the Banks, and ¶¶ 112 and 117 undertake to allege damages. The substance of the alleged breach is the pump-and-dump scheme, by which the Directors allegedly (1) inflated AremisSoft's stock price by misrepresenting the company's finances and then (2) unloaded overpriced shares on the investing public. This scheme is perceived to have been disloyal, in the sense that the Directors allegedly used their positions of trust to pursue personal gain at the expense of the corporation. The substance of the knowing-participation contention is that the Banks allegedly knew of the Directors' large-scale insider trading activities and provided material assistance despite this knowledge.

The damages element takes more effort to understand, as the complaint pleads that the scheme damaged "the Plaintiffs," a term the complaint defines as the Trustees. The Trustees, obviously, are not claiming that they or the Trust were damaged directly; rather, they are claiming damage in their capacity as assignees of the true injured parties. This raises a question: who are the alleged injured parties? The Banks would have us believe that the injured parties are the Purchasers in their individual capacities as purchasers of securities. The Trust, on

---

[12] In using the word "undertake," we remain agnostic as to whether the pleadings succeed as a matter of law in framing the intended claims, as that is a Rule 12(b)(6) question that is not before us.

11

the other hand, would have us believe that the injured party is, at least in the first instance, AremisSoft.

To better understand the question, we turn again to Delaware law,[13] the substantive backdrop of these causes of action. As explained in note 9, *supra*, individual shareholders do not have standing to assert directly state-law claims alleging harm to a corporation. *See Tooley v. Donaldson, Lufkin & Jenrette*, 845 A.2d 1031, 1034 (Del. 2004) (Veasey, C.J.). Instead, those claims must be asserted by the corporation itself or through shareholder derivative litigation. Here, determining whether the Trust complains of harm to the corporation or to the Purchasers individually is not entirely straightforward because a pump-and-dump scheme could be expected to cause two overlapping types of harm that are treated differently by Delaware law. On the one hand, the Purchasers allegedly overpaid for AremisSoft stock, and were thus harmed to the extent of the value discrepancy between what they paid and what they received. Delaware law recognizes this as a direct harm, though the question may be somewhat academic, as Delaware law seems to provide that the harm is irremediable under state law (in deference to the remedies provided by the federal securities laws). *See Malone v. Brincat*, 722 A.2d 5, 12–13 (Del. 1998) (noting that Delaware does not recognize a state-law cause of action by purchasers against corporate directors for fraud on the market). On the other hand, because of the pump-and-dump scheme, AremisSoft lost its economic viability, as reflected in its declining stock price and eventual bankruptcy. This is, under Delaware law, a purely derivative harm, and one that is remediable if caused by a breach of fiduciary duty. *See Metro Commnc's Corp. BVI v. Adv. Mobilecomm Techs., Inc.*, 854 A.2d 121, 168 (Del. Ch. 2004) (Strine, V.C.) (explaining that a corporation's loss in value or economic viability is, in the first instance, a harm to the corporation and, only derivatively, a

_____

[13] The parties agree that Delaware law applies to the breach-of-fiduciary-duty counts. This is clearly correct, as the claims involve the corporation's internal affairs, and the state of incorporation is Delaware. *See In re Topps Co. S'holders' Litig.*, 924 A.2d 951, 959 (Del. Ch. 2007) (Strine, V.C.) (explaining internal affairs doctrine).

12

harm to its shareholders).

Because a pump-and-dump scheme causes both harms, both harms appear on the face of the complaint. But only the harm to AremisSoft is relevant to a claim for aiding and abetting a breach of fiduciary duty because such individual-purchaser harms are not cognizable under Delaware law. *See Malone*, 722 A.2d at 12–13. The Banks, however, argue that the complaint does not allege harm to AremisSoft. They are mistaken. The complaint revolves around corporate directors and officers allegedly breaching their duty of loyalty to the corporation by artificially inflating the stock price and, with the alleged assistance of the Banks, exploiting the increase for their personal benefit. *See* compl. ¶¶ 20–36 (app. 47–54). Given that the scheme is alleged to have pushed AremisSoft into a liquidating bankruptcy,[14] we conclude that the complaint alleges harm to the corporation. Moreover, the Purchasers complain that the declining stock price and subsequent bankruptcy, compl. ¶ 27 (app. 49), ultimately harmed them. By pleading this derivative harm, the Trust necessarily pleaded the initial harm to the corporation. The fact that AremisSoft no longer exists does not convert its corporate claims into direct shareholder claims; rather, the corporate nature of the claims endures, and ownership of the claims passes to AremisSoft's successor. *See Landry v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 148 (3d Cir. 1973) (Rosenn, J.) (holding that failure of bank did not alter derivative/direct dichotomy, and that shareholders of bank in FDIC receivership may maintain derivative action after making demand on the FDIC).

Reading the complaint against the background of Delaware law, we believe that counts I and II allege aiding-and-abetting claims that originally belonged to AremisSoft, not to the purchasers of AremisSoft stock. We also note that, by arguing only corporate aiding-and-abetting claims before us and before

---

[14] The complaint explains that the stock price was artificially inflated for a time, compl. ¶ 26 (app. 49), that it then declined, compl. ¶ 27 (app. 49), that trading was halted in July 2001, *id.*, and that AremisSoft filed for bankruptcy in March 2002, compl. ¶ 14 (app. 46).

13

the District Court,[15] the Trust has abandoned any purchaser-assigned aiding and abetting claims.

To be clear, we have not yet answered the question whether SLUSA preempts counts I and II. That is a different question, and one that arises subsequent to clarifying what claims these counts have alleged. Having determined that the complaint has pleaded aiding-and-abetting claims originally owned by AremisSoft, and assigned to the Trust by the AremisSoft bankruptcy estate, we are ready to turn to what effect, if any, SLUSA has on them.

### B. Whether counts I and II are brought in the form of a "covered class action"

SLUSA prevents would-be plaintiffs from bringing certain claims in the form of a "covered class action." Under SLUSA, a covered class action is

> any single lawsuit in which damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members.

15 U.S.C. § 78bb(f)(5)(B)(i). The statute further provides that, for purposes of this definition, "a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action." 15 U.S.C. § 78bb(f)(5)(D). This means that the court is to follow the usual rule of not looking through an entity to its constituents unless the entity was established for the purpose of

---

[15] In its opposition to the Banks' motion to dismiss, the Trust made essentially the same argument it makes here: that counts I and II are corporate claims, originally owned by AremisSoft, and assigned to the Trust by the AremisSoft bankruptcy estate. App. 482–85.

bringing the action, *i.e.*, to circumvent SLUSA.

The District Court concluded that counts I and II were brought "on behalf of" the 6000 beneficiaries of the Trust, and thus as "covered class actions." D. Ct. Op. at 12 (app. 14). In arriving at this conclusion, the District Court ruled that the Trust should not be counted as a single entity under § 78bb(f)(5)(D) because it was established for the primary purpose of litigating shareholder claims. Accordingly, the District Court dismissed counts I and II.

To evaluate the District Court's ruling, it is first necessary to recall the nature and ownership of these claims. As explained above, counts I and II plead claims that at one time belonged to AremisSoft, the entity allegedly injured by its Directors' breaches of duty and the Banks' aiding those breaches. In bankruptcy, the claims passed to AremisSoft's bankruptcy estate, 11 U.S.C. § 541(a)(1) & Note (explaining that the debtor's interest in legal claims passes to its bankruptcy estate), but the debtor-in-possession did not assert them during the pendency of the bankruptcy. Rather, the bankruptcy estate assigned them to the Trust, a state-law entity created in large part to pursue these and similar claims for the ultimate benefit of the Purchasers, the only group whose interests were impaired by the plan of reorganization.[16] Thus, the Trust can only bring these claims as assignee of the bankruptcy estate.

At first glance, one might think that the claims are

_____

[16] Though the parties do not go into detail on this point, one would assume that this deal was struck so that the Purchasers would vote to approve the plan of reorganization, even though their interests were impaired. *See* 11 U.S.C. § 1126 (providing that impaired claim and interest holders are entitled to vote on plan approval). For a plan to be approved, either (1) each impaired class must accept the plan, or (2) the bankruptcy court must approve the plan as "fair and equitable" despite a class's disapproval. 11 U.S.C. § 1129(b). To avoid having to obtain the court's consent to an unapproved plan (known as a "cramdown"), parties to a bankruptcy often work hard to negotiate a plan that all impaired classes will accept.

15

brought "on behalf of" the Purchasers, as they, through the Trust, are the current beneficial owners of the claims.[17] But examining the whole of the covered-class-action definition is instructive. The definition is two-pronged: to be a covered class action, (1) the claim must be brought "on behalf of 50 or more persons," and (2) questions of law or fact common to "*those persons*" must predominate. 15 U.S.C. § 78bb(f)(5)(B)(i) (emphasis added). If we read "on behalf of 50 or more persons" as referring to the Purchasers, the second prong of the definition would lack any pertinence, because the Purchasers, for purposes of counts I and II, are merely the beneficial owners of the claims.[18] There are no questions of law or fact that involve them, much less common ones that predominate over individual ones. Rather, the relevant issues are (1) whether the Directors were fiduciaries of AremisSoft, (2) whether the Directors made misrepresentations or traded on inside information in violation of their fiduciary duties, (3) whether the Banks provided material assistance with the requisite knowledge to be liable for aiding and abetting, and (4) whether AremisSoft was damaged by the concerted actions of the Directors and Banks.[19] *Gotham Partners*, 817 A.2d at 172 (setting out elements of aiding and abetting a breach of fiduciary duty). Neither these elements nor

___

[17] Because common-law trustees carry out all of their duties in the sole interest of the trust's beneficiaries, *see* Restatement (Third) of Trusts § 78 (2007) (describing the sole-interest rule), they can be said to act on those beneficiaries' behalf.

[18] AremisSoft's bankruptcy estate assigned the claims to the Trust. Thus, legal title to the claims rests in the Trust; beneficial title rests in the Purchasers (as beneficiaries of the Trust).

[19] Delaware courts view aiding-and-abetting-a-breach-of-fiduciary-duty as a form of civil conspiracy. *Allied Capital Corp. v. GC-Sun Holdings, LP*, 910 A.2d 1020, 1038 (Del. Ch. 2006) (Strine, V.C.). The proper remedy generally is to hold the abettor jointly and severally liable for whatever remedies are appropriate to make good on the fiduciary's breach. *See Gotham Partners*, 817 A.2d at 173 (affirming Chancellor's decision to hold abettors jointly and severally liable for damages caused by breach of fiduciary duty).

the facts underlying them have anything to do with the Purchasers. The Purchasers need not prove anything regarding themselves in order to succeed; indeed, they need not even prove that they were injured, as they are not proceeding as injured parties, but as persons to whom beneficial ownership of the claims was assigned by the true injured party, AremisSoft.[20]

Prong two of § 78bb(f)(5)(B)(i), then, seems to use the terms "persons" and "members of the prospective class" to refer to the original owners of the claim—those injured by the complained-of conduct, as those are the persons who might have common questions of law or fact related to the claim that predominate over individual questions of law or fact. Reading prong one in light of prong two, the phrase "on behalf of 50 or more persons" seems to refer to someone bringing a claim on behalf of 50 or more *injured* persons. In other words, the phrase refers to the assignors of a claim, not to the assignee (or, if the assignee is a trust, to its beneficiaries). Under this reading, the Trust is not bringing its claims "on behalf of" the Purchasers, as SLUSA uses the term, because the Purchasers are not the injured parties; rather, the Trust is bringing the claims "on behalf of" AremisSoft.

Section 78bb(f)(5)(D) buttresses this interpretation by clarifying that corporations are not to be counted as more than one person unless established for the purpose of litigation. In other words, when a corporation decides to bring a state-law

---

[20] In contrast, were the Purchasers bringing a § 10b-5 securities claim, four of the six elements of that claim would involve them directly. The first two elements—a material misrepresentation and *scienter*—would involve only the Directors. But the Purchasers would also have to prove (1) a connection between the misrepresentation and *their* purchase or sale of securities, (2) that the misrepresentation was a but-for cause of *their* purchases ("transaction causation"), (3) *their* economic loss, and (4) a connection between the misrepresentation and *their* loss ("loss causation"). *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 424-25 (3d Cir. 2007) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)); *see also Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. ___, 128 S.Ct. 761, 768 (2008).

17

claim—even one alleging misrepresentations in connection with securities trades—SLUSA does not instruct the court to look through the corporation to its shareholders to determine the number of "persons;" instead, the corporation, in keeping with well-entrenched common-law principles, is counted as the one juridical person that it is. *Cf. In re Owens-Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (noting that "courts respect entity separateness absent compelling circumstances"). SLUSA's single exception to this rule is that when the corporation is established for the purpose of litigation, *i.e.*, when plaintiffs try to avoid SLUSA by running their securities claims through a corporate entity, the court should look to the corporation's constituents. Here, no one argues that AremisSoft, the original owner of counts I and II, was established for the purpose of this (or any other) litigation. Moreover, even if the Trust can be deemed to have been established for the purpose of litigation, a question we need not address, looking through it would only get the court to AremisSoft, the injured party, not to the Purchasers.

Section 78bb(f)(5)(C) also supports this reading. It provides that exclusively derivative actions are not covered class actions for SLUSA purposes. Although, as the Banks note, the claims at issue here are not asserted derivatively, § 78bb(f)(5)(C) operates to preserve causes of action that belong to corporations, even if 50 or more shareholders bring such actions derivatively. What we take from reading § 78bb(f)(5)(C) and (D) together is that Congress did not intend SLUSA to reach *any* corporate-originated claims, whether asserted by the corporation (or its assignee), as is addressed in § 78bb(f)(5)(D), or asserted derivatively by shareholders, as is addressed in § 78bb(f)(5)(C).[21]

---

[21] The derivative-litigation exception to SLUSA preemption is commonly referred to as one of two "Delaware carve-outs." *Malone*, 722 A.2d at 13. According to the Senate committee, the purpose of this carve-out was to ensure that shareholders would be able to bring derivative litigation based on corporate fiduciaries' breaches of duty. S. Rep. No. 105-182, at *6 (1998). It is referred to as a "Delaware" carve-out because most such litigation occurs in Delaware before the Chancery Court.

A key point to remember is that it would make little sense

18

Further supporting this reading is Congress's clear intent not to reach claims asserted by a bankruptcy trustee on behalf of a bankruptcy estate. That Congress so intended is relevant here because counts I and II were claims that the debtor-in-possession once owned and chose to assign to the Trust (under the assumption that the Trust would be able to bring the claims as the debtor-in-possession's assignee). Congress's intent on this point is clear from the legislative history, in which the Senate Banking, Housing, and Urban Affairs Committee reported that, in the final version of the bill,

> [t]he class action definition has been changed from the original text of S. 1260 to ensure that the legislation does not cover instances in which a person or entity is duly authorized by law, other than a provision of state or federal law governing class action procedures, to seek

---

for Congress to preserve derivative actions but preempt corporate direct actions, as doing so would turn our conception of derivative litigation on its head. Shareholder derivative litigation is a failsafe, a means of allowing corporate claims to go forward when the corporation's board wrongfully refuses to prosecute them. *See Grimes v. Donald*, 673 A.2d 1207, 1216 (Del. 1996) (explaining that derivative litigation may only proceed when the board wrongfully refuses to pursue the action). It is a limited exception to the rule that corporations, like natural persons, have the unfettered discretion to decide whether to take legal action when they are wronged. *See Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984) ("The bedrock of the General Corporation Law of the State of Delaware is the rule that the business and affairs of a corporation are managed by and under the direction of its board. . . . [B]ecause the derivative action impinges on the managerial freedom of directors, the law imposes certain prerequisites to the exercise of this remedy."). Derivative litigation is premised on the notion that the corporation could bring the proffered action on its own behalf. *See Grimes*, 673 A.2d at 1216 (explaining that if the corporation deems proposed derivative litigation beneficial, it can take over and control the litigation). If this premise were not true, the moniker "derivative" would be inappropriate, as the shareholder litigation would not be derived from any cause of action the corporation possessed.

> damages on behalf of another person or entity. Thus, *a trustee in bankruptcy*, a guardian, a receiver, and other persons or entities duly authorized by law (other than by a provision of state or federal law governing class action procedures) to seek damages on behalf of another person or entity would not be covered by this provision.

S. Rep. No. 105–182, at 8 (May 4, 1998) (emphasis added). The original text of the bill would have brought within the definition of class action any action in which "one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated," or "one or more of the parties seeking to recover damages did not personally authorize the filing of the lawsuit." S. 1260, 105th Cong. § 2 (as introduced in the Senate, Oct. 7, 1997). Whether either of these provisions would have been read to cover a bankruptcy trustee is unclear; what is clear is that Congress sought to ensure that no provision of the bill as enacted would do so. In addition, the caselaw supports the notion that when a trustee brings a claim belonging to the bankruptcy estate, the claim is not a covered class action for SLUSA purposes. *Smith v. Arthur Andersen, LLP*, 421 F.3d 989, 1007–08 (9th Cir. 2005). Here, as the Trust is merely the assignee of the AremisSoft bankruptcy estate, it should be treated the same way.

Giving effect to Congress's desire not to preempt claims that pass from a debtor corporation to its bankruptcy estate is important because to do otherwise would work a significant change in the bankruptcy system that Congress created and, according to the legislative history cited above, intended to leave undisturbed. As this case demonstrates, legal claims can be some of the most important and valuable assets that a bankruptcy estate has, particularly as respects a debtor's unsecured creditors and equity holders, since liquidating such claims may be their only chance at significant recovery. Chapter 11 is often described as a process that brings all interested parties to the bargaining table and encourages them, against the background of insolvency law, to work out a plan of reorganization with which

20

they all can live.[22]  For this process to work, the parties must be able to gather, assess, and freely alienate and distribute the estate's assets.  Under the Banks' argument, SLUSA preemption would prevent the estate from assigning certain legal claims to any class of creditors or equity holders containing more than 50 persons, but it would allow assignment to classes with fewer constituents.  This result would make little sense, as we see no indication that Congress's aim in fashioning the "covered class action" definition was to control the number of constituents to whom a bankruptcy estate's claim is assigned.  Rather, the statutory text and legislative history signal that the definition was designed to prevent securities-claims owners from bringing what are, in effect, class actions by assigning claims to a single entity.  *See Golub v. Hill, Rogal & Hobbs Co.*, 379 F. Supp. 2d 639, 643 (D. Del. 2005) (ruling that more than 50 persons could not circumvent SLUSA by assigning their claims to a trust).  Put simply, Congress's goal was to prevent a class of securities plaintiffs from running their claims through a single entity, not to prevent a single bankruptcy estate from assigning its claims to an entity capable of acting to protect the common interests of a class of people.

Moreover, it is difficult to see what purpose would be served by holding otherwise.  If we held that the key issue is to whom a claim is assigned, then we would likely see two results.  First, we might see parties to bankruptcies engage in some rather creative class construction to keep numbers below 51.  Parties' ability to do this would not turn on any factor related to preventing frivolous securities litigation, but on the creativity of the parties' lawyers and the particulars of a debtor's pre-petition liabilities.  Second, in many bankruptcies, treating unliquidated legal claims as distributable assets would become infeasible.  Rather than assigning unliquidated claims to large classes of

---

[22] *See, e.g.*, A. Mechele Dickerson*, The Many Faces of Chapter 11: A Reply to Professor Baird*, 12 Am. Bankr. Inst. L. Rev. 109, 113, 125 (2004); Select Advisory Comm. on Bus. Reorganization, *First Report of the Select Advisory Comm. on Bus. Reorganization*, 57 Bus. Law. 163, 197 & n.58 (2001); Richard F. Broude, *Cramdown & Chapter 11 of the Bankruptcy Code: The Settlement Imperative*, 39 Bus. Law. 441, 454 (1984).

creditors, the debtor-in-possession would have to initiate a lawsuit, prosecute any claims to their conclusion, and then distribute the proceeds to the estate's creditors and interest holders. We fail to see what salutary effect this would have on deterring frivolous securities litigation; the only likely result would appear to be a marked increase in the difficulties attendant on reorganizing Chapter 11 debtors in a timely fashion, a consequence we see no indication Congress intended.

The Banks present the curious argument that recognizing that the claims at issue here are corporate in nature does the Trust no good, because the claims are still brought on behalf of the 6000 Purchasers. If the claims are also brought on behalf of AremisSoft, then, according to the Banks, that brings the grand total of persons on whose behalf the claims are brought to 6001. This argument, which neither brief explains in more than two sentences, *see* Bordier Br. at 44, Dominick Br. at 54, seems to misapprehend that the corporate claims are not asserted on behalf of the corporation *and* Purchasers (thus, 6001 persons), but on behalf of the corporation alone. The Banks further note that all damages will go to the Purchasers. This, however, is irrelevant because the Purchasers would not recover in their capacities as individual purchasers of securities, but in their capacities as beneficial owners of the claims assigned to the Trust by the AremisSoft bankruptcy estate.

In sum, we conclude that a corporation's claims do not take the form of a "covered class action," irrespective of whether the claims are asserted by the corporation directly, its shareholders derivatively, its bankruptcy estate, its bankruptcy estate's assignee, or its successor. This conclusion accords with the text of § 78(f) and with Congress's intent, as reflected in the legislative history, not to preempt corporate claims, and to leave the bankruptcy process undisturbed.

## IV.    Counts III and IV — Violation of Swiss money-laundering laws

In addition to pressing aiding-and-abetting claims in counts I and II, the Trust has alleged in counts III and IV that the Banks violated Swiss banking regulations by failing properly to

22

investigate and interdict the Directors' alleged money-laundering transactions. The Trust has further alleged that it, as assignee of the Purchasers, is entitled, under Swiss law, to recover damages for the Banks' violations.

It is important to recognize that these counts, unlike counts I and II, are not alleged to have been owned by AremisSoft or its bankruptcy estate. These Swiss-law claims are, rather, claims owned by the Purchasers as individual purchasers of AremisSoft stock. They were assigned by the Purchasers to the Trust so that they could be prosecuted together with counts I and II. Thus, in contrast to counts I and II, these counts likely are brought to recover damages "on behalf of more than 50 persons," 15 U.S.C. § 78bb(f)(5)(B)(i)(I), so they would seem to take the form of a covered class action.

SLUSA, however, only preempts covered class actions "based upon the statutory or common law of any *State*," 15 U.S.C. § 78bb(f)(1) (emphasis added), where "State" is defined as "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States," *id.* § 78c(a)(16). Despite this seemingly clear language, the Banks contend that SLUSA preempts the Trust's Swiss-law claims because: (1) Congress intended to preempt foreign-law claims (though it did not so state in the text of the statute); (2) the Swiss-law claims are "based upon" state law because the Banks' violation of Swiss law is dependent on the Directors' breach of their state-law fiduciary duties—that is, only if the Directors breached their state-law fiduciary duties can the Banks be liable under Swiss law; (3) the Swiss-law claims are "based upon" state law because New Jersey's choice-of-law rules are "state laws" that trigger application of Swiss law to the present dispute; (4) the Swiss-law claims incorporate the allegations of the state-law claims; and (5) the Swiss-law claims are too closely tied to the state-law claims.

## A.    Congress's intent

The Banks argue that the purpose of SLUSA is to create uniform standards for class-action securities-fraud lawsuits, and that allowing plaintiffs to avail themselves of different foreign-

law standards is inconsistent with that purpose. Thus, they argue that SLUSA should be read as preempting foreign-law claims that otherwise contain the class-action and securities-trade ingredients. Essentially, this is an argument that Congress implicitly preempted foreign law because allowing more than 50 plaintiffs to initiate a foreign-law-based securities fraud suit in a state or federal court would impede the federal objective of providing uniform standards for class-action securities fraud litigation. *Cf. Perez v. Campbell*, 402 U.S. 637 (1971) (holding that federal bankruptcy law preempted a state law that interfered with federal bankruptcy law's goal of providing uniform standards for determining discharge of debt).

In determining legislative purpose, "[i]t is not our job to speculate upon congressional motives," *Riegel v. Medtronic, Inc.*, 552 U.S. ___, 2008 WL 4407744 (Feb. 20, 2008); our job is to hew as closely as possible to the meaning of the words Congress enacted. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). Here, the difficulty with divining congressional intent to preempt foreign-law claims is that Congress specifically described the claims preempted as those "based upon the law of any State." SLUSA constitutes an amendment of the Securities Exchange Act of 1934 (the "1934 Act"), which expressly defines "state" throughout the Act as "any State of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, or any other possession of the United States," 15 U.S.C. § 78c(a)(16). Though Congress was at pains to set out separate definitions of various terms used in SLUSA, it left the 1934 Act definition of "state" intact.

Moreover, Congress has demonstrated its ability to extend the reach of securities statutes to foreign law when it so desires. *E.g.*, 15 U.S.C. § 78o(b)(4)(B) (requiring punishment of a broker or dealer convicted of any "felony or misdemeanor or of a substantially equivalent crime by a *foreign court*," if (among other things) the offense arises from the conduct of any entity required to be registered under the Commodity Exchange Act "*or any substantially equivalent foreign statute or regulation*") (emphasis added). Moreover, SLUSA's legislative history refers

to state, not foreign, law. *E.g.*, S. Rep. No. 105-182, at 1 (1998); H.R. Rep. No. 105-803, at 1 (1998) (stating that Congress's intent is to "limit the conduct of securities class actions under State law"). Given that Congress made the explicit policy choice in the 1934 Act of defining "state" so as not to include foreign countries, and, in SLUSA, chose not to alter that definition while defining other terms, *see* 15 U.S.C. § 78bb(f)(5) (defining terms), we conclude that, when Congress extended SLUSA preemption to claims "based upon the law of any State," it meant just that.

In addition, the notion that allowing the Trust to litigate counts III and IV would impede a federal objective is overblown. According to those counts, Switzerland imposes liability for the complained-of conduct on banking institutions organized under Swiss law. To state the obvious, Switzerland is a sovereign nation. It may regulate institutions organized under its laws in any manner it sees fit. Congress, through 28 U.S.C. § 1332, has instructed United States district courts to entertain "all civil actions" (provided the matter in controversy is of sufficient value), as long as there is complete diversity of citizenship. To be sure, Congress has the authority to counter-instruct district courts not to entertain particular categories of civil actions arising under foreign law, but we do not believe that we should readily imply such a result from statutory text that appears to direct otherwise.

### B.   Whether the Swiss-law claims depend on state law

The Banks argue that the Swiss-law claims are preempted because they are actually based on Delaware fiduciary-duty law. Specifically, they argue that only if the Directors breached their Delaware-law fiduciary duties can the Banks be liable under Swiss law. This argument appears to be based upon a misreading of the complaint. The Swiss laws invoked in the complaint allegedly require that, *inter alia*, Swiss banks conduct due diligence (*e.g.*, verify the customer's identity), investigate unusual or suspicious transactions, and freeze assets in accounts whose owner has been concealed. App. at 54–57, 80–81. We read the complaint as alleging that a bank can violate these

Swiss laws regardless whether the account owners in fact breached a state-law fiduciary duty.[23]

### C. Whether the Swiss-law claims arise under New Jersey law because of the application of New Jersey choice-of-law rules

The Banks' third argument—that New Jersey's choice-of-law rules are "state laws" that trigger application of Swiss law to the present dispute, thus forming the Swiss laws' basis—is creative but unpersuasive.[24] The Banks point out that the District Court's subject matter jurisdiction is based on diversity of citizenship, which, under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) and *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), requires that the forum state's (here, New Jersey's) choice-of-law rules govern the dispute. It is these choice-of-law rules that, the Trust contends, direct application of Swiss law. *Id.* The Banks, invoking *Klaxon*, argue that, if the Trust's characterization of New Jersey's choice-of-law rules is correct, those New Jersey choice-of-law rules form the basis of the Trust's Swiss-law claims.

The Banks read more into *Klaxon* than is there. In *Klaxon*, a diversity action brought by a New York corporation against a Delaware corporation in the District Court for the District of Delaware, plaintiff, having secured a jury verdict in the amount of $100,000, then moved for an award of pre-judgment interest covering the years in which the suit was pending. The District Court granted the motion. This court affirmed: without addressing Delaware law with respect to contract damages, this court ruled, in reliance on two provisions

---

[23] Of course, should further examination of the Swiss-law claims on remand reveal that the Trust's characterization of Swiss law is in error, the District Court may reconsider this issue at that time.

[24] This argument emerges from the Banks' attempt to characterize the Swiss-law claims as "based upon the statutory or common law of any State," *see* 15 U.S.C. § 78bb(f)(1), here, New Jersey.

26

of the Restatement of Conflicts, that "[t]he measure of damages for breach of contract is determined by the law of the place of performance," and that interest was an element of damages. *Stentor Elec. Mfg. Co. v. Klaxon Co.*, 115 F.2d 268, 275 (3d Cir. 1940).  The Supreme Court reversed:

> The conflict of laws rules to be applied by the federal court in Delaware must conform to those prevailing in Delaware's state courts.  Otherwise the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side.  Any other ruling would do violence to the principle of uniformity within a state upon which the *Tompkins* decision is based.  Whatever lack of uniformity this may produce between federal courts in different states is attributable to our federal system, which leaves to a state, within the limits permitted by the Constitution, the right to pursue local policies diverging from those of its neighbors.  It is not for the federal courts to thwart such local policies by enforcing an independent 'general law' of conflict of laws. Subject only to review by this Court on any federal question that may arise, Delaware is free to determine whether a given matter is to be governed by the law of the forum or some other law.

313 U.S. at 496–97.

In the case at bar, the Trust contends that New Jersey's choice-of-law rules require that, in a dispute in a New Jersey court in which Swiss banks are charged with failing to comport with proper standards of oversight of entities utilizing the services of Swiss banks, Swiss law, not New Jersey law, should govern.  If the Trust's formulation of New Jersey's choice-of-law rules, as embodied in counts III and IV of it complaint, is accurate, this would reflect the unsurprising conclusion by New Jersey's lawgivers, whether judicial or legislative, that, whatever New Jersey's law with respect to bank misconduct may be, when the allegedly miscreant bank is a Swiss enterprise executing Swiss banking transactions, Swiss banking law, not New Jersey banking law, should control.  To conclude that, within the intendment of SLUSA, those claims are "based upon the . . . law

of" New Jersey would require attributing to Congress a subtlety of such exquisite reach as to have no place in the legislative process.

> **D. Whether the Swiss-law claims are preempted because they incorporated the allegations of the state-law claims**

The District Court held, and the Banks argue, that because counts III and IV "reallege and incorporate by reference herein in their entirety the allegations" supporting the state-law claims, App. at 78, 80, and the state-law claims are, as the Banks contend, preempted, the Swiss-law claims must also be preempted. Aside from the fact that we are not persuaded that the state-law claims are preempted, the view advanced by the District Court and the Banks appears to stem from a misinterpretation of language in this court's opinion in *Rowinski*, 398 F.3d at 305.

In *Rowinski*, we held that a claim alleges "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security, " 15 U.S.C. § 78bb(f)(1)(A), which subjects it to SLUSA preemption, when an allegation of a misrepresentation in connection with a securities trade is a "factual predicate" of the claim, even if misrepresentation is not a legal element of the claim. *Rowinski*, 398 F.3d at 300. Thus, when, as in *Rowinski*, a plaintiff alleges that a misrepresentation made in connection with a securities trade breaches a contract, the plaintiff cannot avoid SLUSA preemption by arguing that misrepresentation is not an element of a breach-of-contract action. In other words, when one of a plaintiff's necessary facts is a misrepresentation, the plaintiff cannot avoid SLUSA by merely altering the legal theory that makes that misrepresentation actionable.

It is important to recognize that *Rowinski* did not hold that any time a misrepresentation is alleged, the misrepresentation-in-connection-with-a-securities-trade ingredient is present. (Nor does it follow that failing to make such an allegation explicit necessarily avoids the ingredient). Rather, the point we made in *Rowinski* was that when an allegation of misrepresentation in

28

connection with a securities trade, implicit or explicit, operates as a factual predicate to a legal claim, that ingredient is met. To be a factual predicate, the fact of a misrepresentation must be one that gives rise to liability, not merely an extraneous detail. This distinction is important because complaints are often filled with more information than is necessary. While it may be unwise (and, in some cases, a violation of Rule 8) to set out extraneous allegations of misrepresentations in a complaint, the inclusion of such extraneous allegations does not operate to require that the complaint must be dismissed under SLUSA.

Here, as to the Swiss-law claims, the allegations of misrepresentation appear to be extraneous. As explained in Part IV.B, *supra*, the Swiss-law counts allege that the Banks violated their Swiss-law duty properly to investigate and freeze the Directors' various money-laundering transactions. The Directors' prior alleged misrepresentations are not factual predicates to these claims because, according to the Trust's characterization of the Swiss-law claims, they have no bearing on whether the Banks' conduct is actionable; rather, they are merely background details that need not have been alleged, and need not be proved.[25]

### E. Whether Swiss-law claims are tied so closely to the state-law claims that they are preempted

The District Court also held, and the Banks argue, that the Swiss claims are preempted because they are tied so closely to the state-law claims. This argument is also unpersuasive because it relies on a readily distinguishable case. The District Court and the Banks invoke a decision of the District Court for the District of Delaware, ruling that a particular *state*-law claim, though it did not specifically allege conduct that would constitute fraud "in connection with" a security, was nonetheless "in connection with" a security (and thus preempted), *see* 15 U.S.C. § 78bb(f)(1)(A), because it alleged conduct by the defendant that was part of a "'unitary scheme of fraud' which

---

[25] Again, if, on remand, it is revealed that the Trust's characterization of Swiss law on this point is inaccurate, the District Court may reconsider this issue at that time.

began before the 'purchase or sale' of securities and continued afterward." *Zoren v. Genesis Energy, L.P.*, 195 F. Supp. 2d 598, 604–06 (D. Del. 2002). Because the claim was in this sense "tie[d] . . . so closely" to the other claims that clearly alleged fraud in connection with securities trading, the claim was itself deemed a claim of fraud in connection with securities trading and therefore preempted. *Id. Zoren* simply involved an application of SLUSA's "in connection with" language, 15 U.S.C. § 78bb(f)(1)(A), concluding that the claim in question alleged fraud in connection with securities trading.

*Zoren* is distinguishable in two respects. First, unlike the Banks here, the defendants in *Zoren* were accused of orchestrating a "unitary scheme of fraud." Here, the Banks are not accused of any misrepresentations or omissions; rather, their alleged participation in the Directors' scheme is limited to participating in insider-trading transactions and assisting in laundering the proceeds. Second, *Zoren* involved exclusively state-law claims and applied the "in connection with" language, not the ingredient that any preempted claims be based upon "state" law. It did not address a foreign-law claim or even purport to address how its analysis would affect foreign-law claims.

Thus, we conclude that the Banks' contention that the Swiss claims are preempted as "closely tied" to the state-law claims is without merit.

## V.     Circumventing SLUSA

Permeating the Banks' briefs is the general argument that allowing these claims to go forward will re-create a loophole for abusive securities litigation that Congress intended, through SLUSA, to close. We find this argument unpersuasive.

As to the state-law claims—counts I and II—our ruling is that a group of persons may bring a corporation's claim for breach of fiduciary duty (or aiding and abetting such a breach) in two circumstances: (1) when the group has been assigned the corporation's claim, or (2) when the group fulfills all applicable requirements for bringing the claim derivatively. That the latter

30

is no easy task goes without saying; moreover, Congress explicitly excepted it from SLUSA's purview. As to the former, we have difficulty imagining such assignments occurring outside very special contexts, such as bankruptcy, a context in which Congress clearly intended fiduciary-duty actions to go forward.

As to the foreign-law claims, notwithstanding our holding, plaintiffs relying on foreign law must survive two preliminary challenges: (1) ) they must state validly pleaded claims which, under applicable choice-of-law principles, govern their case, and (2) they must show that a United States court is the most convenient forum, which, particularly for foreign-law claims asserted against foreign entities, is rarely an easy task. In other words, foreign-law claims, though not preempted by SLUSA, are only permissible at the confluence of two rarely aligned factors: (1) a foreign country has the most significant interest in having its law apply (the traditional choice-of-law test), and (2) the United States is the most appropriate forum (the traditional *forum-non-conveniens* test). Nothing in our experience, the legislative history of SLUSA, or the legislative history of the PSLRA suggests that these are hurdles that plaintiffs can routinely overcome. Thus, as Congress intended, manifest strike suits will, expectably, be dismissed on the pleadings, even if the plaintiffs try to plead foreign claims. Only quite unusual cases will survive.[26]

## VI.    Conclusion

We hold that SLUSA does not prevent the Trust from bringing AremisSoft's Delaware-law aiding-and-abetting-breach-of-fiduciary-duty claims against the Banks. These are direct corporate claims assigned to the Trust from AremisSoft's bankruptcy estate. SLUSA's text and legislative history yield the conclusion that Congress did not intend to preempt direct corporate claims such as these.

We further hold that SLUSA does not prevent the Trust

---

[26] The Banks have not yet raised a failure-to-state-a-claim or a *forum non conveniens* challenge to the District Court's continued involvement with this case.

from asserting Swiss-law claims against the Banks for violating Swiss money-laundering regulations. This conclusion flows directly from the text of SLUSA, which by its terms only affects claims based upon the laws of a state or territory of the United States.

Therefore, we will vacate the District Court's order dismissing the complaint, and remand for further proceedings consistent with this opinion.