[955 NE2d 329, 931 NYS2d 22]

THE RGH LIQUIDATING TRUST, on Behalf of RELIANCE GROUP HOLDINGS, INC., and Others, Appellant, v DELOITTE & TOUCHE LLP et al., Respondents.

Argued April 27, 2011; decided June 23, 2011

## POINTS OF COUNSEL

*Gage Spencer & Fleming LLP*, New York City (*William B. Fleming* and *G. Robert Gage, Jr.*, of counsel), for appellant. I. The RGH Liquidating Trust should be treated as "one person" under the Securities Litigation Uniform Standards Act's single-entity exemption. (*Matter of Lower Manhattan Loft Tenants v New York City Loft Bd.*, 66 NY2d 298; *Scaringi v Broome Realty Corp.*, 154 Misc 2d 786; *State of Maryland v Antonelli Creditors' Liquidating Trust*, 123 F3d 777; *In re Boston Regional Med. Ctr., Inc.*, 410 F3d 100; *In re Refco, Inc. Sec. Litig.*, 628 F Supp 2d 432; *LaSala v Bordier et Cie*, 519 F3d 121; *Smith v Arthur Andersen LLP*, 421 F3d 989; *Cape Ann Invs. LLC v Lepone*, 296 F Supp 2d 4.) II. The First Department's dismissal of the claims of the five bondholders specifically identified in the amended complaint was improper. (*Smith v Arthur Andersen LLP*, 421 F3d 989.)

*Kramer Levin Naftalis & Frankel LLP*, New York City (*Michael J. Dell* and *Adina C. Levine* of counsel), for respondents. I. The First Department's unanimous ruling that The RGH Liquidating Trust's claims on behalf of the bondholders are precluded by Securities Litigation Uniform Standards Act should be affirmed. (*LaSala v Bordier et Cie*, 519 F3d 121; *Golub v Hilb, Rogal & Hobbs Co.*, 379 F Supp 2d 639; *Kircher v Putnam Funds Trust*, 547 US 633; *Editorial Photocolor Archives v Granger Collection*, 61 NY2d 517; *INS v National Center for Immigrants' Rights, Inc.*, 502 US 183; *People v Realmato*, 294 NY 45; *Cape Ann Invs. LLC v Lepone*, 296 F Supp 2d 4; *Smith v Arthur Andersen LLP*, 421 F3d 989; *Flanagan v Prudential-Bache Sec.*, 67 NY2d 500; *United States v Banks*, 514 F3d 959.) II. Alternatively, the Appellate Division's decision should be affirmed on other grounds because The RGH Liquidating Trust has not stated bondholder claims. (*Matter of Chasm Hydro, Inc. v New York State Dept. of Envtl. Conservation*, 14 NY3d 27; *Matter of OnBank & Trust Co.*, 90 NY2d 725; *Public Serv. Mut. Ins. Co. v Goldfarb*, 77 AD2d 521; *Reno v Bull*, 226 NY 546; *Megaris Furs v Gimbel Bros.*, 172 AD2d 209; *Eurycleia Partners, LP v Seward & Kissel, LLP*, 12 NY3d 553; *Greschler v Greschler*, 51 NY2d 368; *Parks v Leahey & Johnson*, 81 NY2d 161; *Waggoner v Caruso*, 68 AD3d 1; *Linden v Moskowitz*, 294 AD2d 114.)

## OPINION OF THE COURT

READ, J.

We hold that The RGH Liquidating Trust (the Trust or the Liquidating Trust), established under the bankruptcy reorganization plan of Reliance Group Holdings, Inc. (RGH) as the debtor's successor, is "one person" within the meaning of the single-entity exemption in the Securities Litigation Uniform Standards Act of 1998 (Pub L 105-353, 112 US Stat 3227 [SLUSA]; *see* 15 USC § 77p [f] [2] [C]; § 78bb [f] [5] [D]).[1] As a result, SLUSA does not preclude Supreme Court from adjudicating the state common-law fraud claims that plaintiff Trust has brought against defendants Deloitte & Touche LLP, an accounting and consulting firm, and Jan A. Lommele, a principal of the firm, for the benefit of RGH's and Reliance Financial Services Corporation's (RFS) bondholders.

---

1. SLUSA was incorporated into both the Securities Act of 1933 (Pub L 73-22, 48 US Stat 74) and the Securities Exchange Act of 1934 (Pub L 73-291, 48 US Stat 881) in substantially similar form.

## I.

RGH, a publicly held company, owned 100% of the stock of RFS, which, in turn, owned 100% of the stock of Reliance Insurance Company (RIC). RIC generated upwards of 90% of the income of RGH, whose principal business was its ownership, through RFS, of RIC and its property and casualty insurance subsidiaries. Deloitte was the independent outside accountant and auditor for RGH, RFS and RIC and its subsidiaries, supplying annual audits of their financial statements; Lommele served as RIC's appointed actuary, responsible for assessing the adequacy of the company's loss reserves.

By the end of 1999, the Reliance companies, their financial condition deteriorating, were edging toward insolvency. RGH suffered an operating loss of $318.3 million in 1999, and, in February 2000, announced that it was suspending its quarterly dividend and extending the maturity of its bank loans. Then in May, RGH reported a $36.5 million operating loss (before gains on sales of investments) for the first quarter of 2000. Sometime in June 2000, RIC stopped underwriting property and casualty insurance. In July, a deal for a major holding company to acquire RGH collapsed, and Moody's Investors Service downgraded its ratings for the company. By December 5, 2000, RGH's shares had fallen 99.9% during the year, closing at 39 cents. On December 6, 2000, the New York Stock Exchange suspended trading of RGH's securities.

On June 22, 2000, certain RGH common stockholders filed a class action complaint (the first of several) in the United States District Court for the Southern District of New York against RGH and three former directors and officers of RGH and RIC. These stockholder plaintiffs alleged that RGH and the individual defendants violated federal securities laws by making false and misleading statements regarding RGH's financial condition, thereby artificially inflating the company's stock price. Subsequently, bondholders launched similar federal securities class actions against RGH and individual directors and officers in the same court. All the cases were consolidated in October 2000. On July 16, 2001, an amended class action complaint was filed on behalf of stockholders who purchased common stock during the period from February 8, 1999 through December 6, 2000, and bondholders who purchased 9% senior notes due November 15, 2000 (hereafter, the senior bondholders) or 9.75% senior subordinated debentures due November 15, 2003 (hereafter, the

subordinated bondholders) (collectively, the bondholders) during that same time period.[2]

On May 29, 2001, the Commonwealth Court of Pennsylvania placed RIC in rehabilitation, and named the Pennsylvania Insurance Commissioner as RIC's rehabilitator. RIC entered liquidation on October 3, 2001, and the Commissioner was appointed liquidator. Meanwhile, on June 12, 2001, RGH and RFS filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York, seeking chapter 11 bankruptcy protection. For administrative and procedural purposes, the court consolidated the two bankruptcies.

On April 22, 2005, RFS's plan of reorganization, approved by the bankruptcy court, went into effect and RFS emerged from bankruptcy as Reorganized RFS Corporation. Under RFS's bankruptcy plan, its litigation claims and those of its general unsecured creditors were assigned to RGH. The bankruptcy court subsequently confirmed RGH's bankruptcy plan—the First Amended Plan of Reorganization of Reliance Group Holdings, Inc. (the Plan), effective December 1, 2005—which created the Trust as successor to RGH pursuant to a Liquidating Trust Agreement and Declaration of Trust (the Trust Agreement). The Plan transferred the bankruptcy estate's assets, which included the litigation claims of RGH, RFS and their respective general unsecured creditors who did not opt out of the Plan, to the Trust.

Specifically, the Plan stated that the Trust was established for the "primary purpose" of "the liquidation of the assets transferred to it." Concomitantly, the Trust Agreement specified that the Trust's "primary purpose" was to "receive the Trust Property and assume the Assumed Liabilities, and thereafter liquidate and distribute the Trust Property for the benefit

---

**2.** In May 2001, the parties to the federal securities class action entered into a Memorandum of Understanding (MOU) and Funding Agreement whereby underwriters of insurance coverage for RGH and its subsidiaries and directors would pay $17.4 million to settle the lawsuit (*see In re Reliance Group Holdings, Inc. Sec. Litig.*, 2004 WL 943545, 2004 US Dist LEXIS 7666 [SD NY 2004] [granting the plaintiffs' motion to enforce the MOU and Funding Agreement and describing the interrelated history of the federal securities class action, RGH's bankruptcy and RIC's liquidation]). The order and final judgment in this lawsuit, signed by the United States District Court Judge on March 22, 2006 and filed four days later, excluded Deloitte and Lommele from the class of persons eligible to participate in the settlement; specified that Deloitte and Lommele were not "Released Parties"; and excluded any claims against them from the definition of "Settled Claims," "Settled Defendants' Claims" and "Settled Insurance Claims."

of the Trust Beneficiaries [i.e., bankruptcy estate creditors]." The Plan defined "Trust Property" as "the Assets that vest in the Liquidating Trust on the [Plan's] Effective Date plus any income earned thereon and all proceeds thereof minus all costs and expenses of and paid by the Liquidating Trust and Distributions [i.e., transfers of cash or other property to those whose claims were allowed]"; and "Assets" as "any and all assets of the Estate as of the [Plan's] Effective Date, whether tangible or intangible, liquidated or unliquidated."

In furtherance of the Trust's primary purpose, the Plan authorized it to

"issue the beneficial interests in the Liquidating Trust to Trust Beneficiaries [i.e., bankruptcy estate creditors], in accordance with the terms hereof, preserve, protect and maximize the value of the Trust Property, evaluate litigation claims, sell or otherwise liquidate the Trust Property as promptly and efficiently as is reasonably possible, and distribute all income and proceeds from the Trust Property in accordance with the terms of the Plan and the Liquidating Trust Agreement."

Under the Trust Agreement, the Trust was permitted to exercise any powers consistent with its powers under the Plan and the Trust Agreement, including investing the Trust's assets; making distributions; paying taxes and any other obligations owed or incurred by the Trust; creating and administering reserves in accordance with the Plan; filing tax returns; and acting in accordance with the various court-approved settlements forming the Plan's basis. The Plan also clarified that the Trust was empowered to object to and/or otherwise resolve any disputed claims against RGH's bankruptcy estate.

On January 6, 2006, the Trust filed an action in Supreme Court against Deloitte and Lommele on behalf of RGH, RFS and their general unsecured creditors, alleging causes of action for actuarial fraud, accounting and auditing fraud, breach of contract and fraudulent conveyance. Defendants moved to dismiss on various grounds, and Supreme Court granted the motion on September 27, 2006; however, as for the creditors' fraud claims, Supreme Court granted the Trust leave to serve and file an amended complaint to plead "reliance and the consequence of that reliance with more specificity" (13 Misc 3d 1219[A], 2006 NY Slip Op 51908[U], *6 [Sup Ct, NY County 2006]). The Trust appealed (except as to the creditors' fraud

claims), and the Appellate Division affirmed (47 AD3d 516 [1st Dept 2008]).

On November 2, 2006, the Trust filed an amended complaint, which alleged two causes of action: one for actuarial fraud against Deloitte and Lommele, and one for accounting and auditing fraud against Deloitte. The Trust asserted these claims for the benefit of unidentified general unsecured creditors; the senior and subordinated bondholders; 15 bank lenders; former employees; and the Pension Benefit Guaranty Corporation (PBGC), a wholly owned United States government corporation and agency of the United States. The Trust committed to distribute any monies recovered on the bondholders' claims on a pro rata basis to a "participant list" maintained by a depository trust company, as well as to those who "have identified [themselves] as bondholders by filing proofs of claims with the Bankruptcy Court." Deloitte again moved to dismiss, now arguing that SLUSA preempted the lawsuit. The Trust countered that it qualified for the so-called single-entity exemption that SLUSA affords "a corporation, investment company, pension plan, partnership, or other entity . . . not established for the purpose of participating in the action" (see 15 USC § 77p [f] [2] [C]; § 78bb [f] [5] [D]).

In a decision dated November 7, 2007, Supreme Court held that the Trust was a single entity within the meaning of SLUSA because its primary purpose was broader than the pursuit of the state law fraud claims. Accordingly, the court granted the motion only as to the Trust's claims on behalf of the unidentified general unsecured creditors, whose reliance was not specifically pleaded (17 Misc 3d 1128[A], 2007 NY Slip Op 52181[U] [Sup Ct, NY County 2007]). Deloitte appealed; the Trust did not cross-appeal.

On December 8, 2009, the Appellate Division modified Supreme Court's order by granting the motion to dismiss the Trust's claims for the benefit of the bondholders (71 AD3d 198 [1st Dept 2009]). The court took the position that the Trust was not exempt from SLUSA as a single entity because "the bondholders' claims against Deloitte [were] not being asserted on behalf of the Reliance bankruptcy estate; the claims originally belonged to the bondholders, not Reliance" (id. at 214). The Appellate Division agreed, however, that Supreme Court properly declined to dismiss the Trust's claims for the benefit of the other groups of creditors—i.e., the 15 banks, two former employees and the PBGC (71 AD3d at 215). On July 8,

2010, the Appellate Division certified the following question to us: "Was the order of the Supreme Court, as modified by this Court, properly made?" For the reasons that follow, we answer the certified question in the negative.

## II.

To combat the perceived harm to markets from frivolous private securities fraud class actions, Congress enacted the Private Securities Litigation Reform Act of 1995 (Pub L 104-67, 109 US Stat 737, codified in part at 15 USC §§ 77z-1, 78u-4 [the PSLRA]; see HR Rep 104-369, at 31-32 [1995]). The PSLRA created hurdles to discourage strike suits,[3] including heightened pleading standards and an automatic stay of discovery once a defendant filed a motion to dismiss. These requirements were intended to make it difficult for plaintiffs to survive a motion to dismiss in nonmeritorious cases. "In enacting these changes, Congress made clear its belief that opportunistic trial lawyers were undermining the securities litigation system and were the primary target of the legislation" (Painter, *Responding to a False Alarm: Federal Preemption of State Securities Fraud Causes of Action*, 84 Cornell L Rev 1, 33-34 [1998]).

But passage of the PSLRA created an incentive for plaintiffs' attorneys to shift class action litigation against publicly traded issuers from federal to state courts (*see* S Rep 105-182, at 3 [1998] [noting that during the course of hearings to review the effect of the PSLRA, "one disturbing trend became apparent; namely, that there was a noticeable shift in class action litigation from federal to state courts"]). Congress worried that this migration endangered "the benefits flowing to investors from a uniform national approach," and, "beyond the number of, and dollar amounts involved, . . . created a ripple-effect that . . . inhibited small, high-growth companies in their efforts to raise capital, and . . . damaged the overall efficiency of our capital markets" (*id.* at 3-4 [internal quotation marks omitted]). To close this " 'federal flight' loophole," Congress enacted SLUSA,

---

3. A "strike suit" has been defined as "an action making largely groundless claims to justify conducting extensive and costly discovery with the hope of forcing the defendant to settle at a premium to avoid the costs of the discovery" (*Francis v Giacomelli*, 588 F3d 186, 193 n 2 [4th Cir 2009], citing 5A Wright and Miller, Federal Practice and Procedure § 1296, at 46 and at 46 n 9]; *see also* Black's Law Dictionary 1572 [9th ed 2009] [defining a strike suit as a lawsuit "based on no valid claim, brought either for nuisance value or as leverage to obtain a favorable or inflated settlement"]).

which effectively vested federal courts with exclusive jurisdiction, subject to stated exceptions not applicable here, for private securities fraud class actions (*see Spielman v Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F3d 116, 123 [2d Cir 2003]).

SLUSA provides that no state *or* federal court may entertain a "covered class action" brought by a private party and based on state statutory or common law, which alleges fraud (misrepresentation or omission of a material fact) or manipulation in connection with the purchase or sale of a "covered security" (15 USC § 77p [b]).[4] To implicate SLUSA, the complaint must advance

> "either (1) an explicit claim of fraud or misrepresentation (e.g., common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that sound in fraud. A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim" (*In re Kingate Mgt. Ltd. Litig.*, 2011 WL 1362106, *6, 2011 US Dist LEXIS 41598, *23-24 [SD NY 2011] [internal quotation marks and citation omitted]).

SLUSA defines a "covered class action" as a "single lawsuit" or "group of lawsuits" in which "damages are sought on behalf of more than 50 persons or prospective class members, and questions of law or fact common to those persons or members . . . predominate over any questions affecting only individual persons or members" (*see* 15 USC § 77p [f] [2] [A] [i] [I]; § 78bb [f] [5] [B] [i] [I]); a "covered security" is one traded nationally and listed on a regulated national exchange (*see* 15 USC § 77p [f] [3]; § 78bb [f] [5] [E]; § 77r [b]). As relevant to this appeal, SLUSA specifies that, for purposes of counting whether there are more than 50 persons or prospective class members, "a

---

4. Courts often talk about SLUSA in terms of "preemption." The United States Supreme Court in *Merrill Lynch, Pierce, Fenner & Smith Inc. v Dabit* (547 US 71, 87 [2006]), however, highlights that

> "SLUSA does not actually pre-empt any state cause of action. It simply denies plaintiffs the right to use the class-action device to vindicate certain claims. The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist."

In *Dabit*, the Supreme Court interpreted SLUSA to preclude suits by "holders" of securities (i.e., those allegedly induced by fraud to retain or delay selling) as well as suits by purchasers or sellers.

corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person or prospective class member, but only if the entity is not established for the purpose of participating in the action" (15 USC § 77p [f] [2] [C]; § 78bb [f] [5] [D]).

Finally, SLUSA makes all "covered class action[s]" removable to the federal district court for the district in which the action is pending (15 USC § 77p [c]; § 78bb [f] [2]). "Congress inserted this provision so that federal courts, rather than state courts, would interpret the scope of the preemption under the statute" (M. Perino, Securities Litigation Under the PSLRA [formerly Securities Litigation After the Reform Act] § 11.03, at 11-14—11-15 [2010]; *see also* HR Rep 105-640, at 16 [noting that the removal provision was meant "to prevent a State court from inadvertently, improperly, or otherwise maintaining jurisdiction over an action" precluded by SLUSA]). The district court must dismiss any removed action that SLUSA precludes (*see Romano v Kazacos*, 609 F3d 512 [2d Cir 2010]). Conversely, the district court must remand a removed action to state court if it decides that SLUSA does not bar the suit; federal appeals courts lack jurisdiction to review an order directing remand (*see Kircher v Putnam Funds Trust*, 547 US 633 [2006]).[5]

The question presented by this appeal is a difficult one, which will ultimately be resolved by the federal courts.[6] The difficulty

---

**5.** Obviously, Deloitte and Lommele elected not to remove this lawsuit to the United States District Court for the Southern District of New York, as they were entitled to do.

**6.** And the federal courts continue to grapple with SLUSA. We note, for example, that two judges in the Southern District of New York are currently considering the question of whether the trustee appointed pursuant to the Securities Investor Protection Act (SIPA) for the consolidated liquidation of Madoff Securities may bring state common-law claims against third parties "for failing to adequately investigate Madoff Securities despite being confronted with myriad red flags and indicia of fraud" (*Picard v HSBC Bank PLC*, 450 BR 406, 409 [SD NY 2011, Rakoff, J.] [internal quotation marks omitted]; *see also Securities Inv. Protection Corp. v Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 2119720, 2011 US Dist LEXIS 44126 [SD NY 2011, McMahon, J.]). Judge Rakoff observed that the trustee would "clearly" be an entity treated as one person under SLUSA "if the Trustee were suing on behalf of the Madoff Securities estate . . . However, . . . the Trustee [was] primarily suing, not on behalf of the Madoff Securities estate, but on behalf of thousands of customers. Thus, whether the Trustee's Action is a 'covered class action' under SLUSA is a novel question" (450 BR at 413). A SIPA trustee is vested

resides in SLUSA's abbreviated treatment of bankruptcy trustees. In discussing the single-entity exemption, the Senate Report accompanying 1998 US Senate Bill S 1260, the bill that became SLUSA, made the point that the drafters had changed

> "[t]he class action definition . . . from the original text of S. 1260 to ensure that the legislation does not cover instances in which *a person or entity is duly authorized by law*, other than by a provision of state or federal law governing class action procedures, *to seek damages on behalf of another person or entity*.[7] Thus, *a trustee in bankruptcy*, a guardian, a receiver, and other persons or entities duly authorized by law (other than a provision of state or federal law governing class action procedures) to seek damages on behalf of another person or entity would not be covered by this provision" (*see* S Rep 105-182, at 8 [emphases added]).

In this case, the Trust is the successor of RGH, the debtor, under the Plan and the Trust Agreement, which were endorsed by the bankruptcy judge in the chapter 11 bankruptcy proceeding. The assets of RGH's bankruptcy estate vested in the Trust, and these assets included claims of the bankruptcy estate's creditors, who are the beneficiaries of any recoveries from Deloitte and Lommele. Thus, it could

---

with the same powers and title with respect to the debtor and the debtor's property as a bankruptcy trustee, in addition to those powers set forth in SIPA (15 USC § 78fff-1 [a]).

7. The original version of S 1260 defined a "class action" as
"[A]ny single lawsuit, or any group of lawsuits filed in or pending in the same court involving common questions of law or fact, in which—
"(A) damages are sought on behalf of more than 25 persons;
"(B) one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated; or
"(C) one or more of the parties seeking to recover damages did not personally authorize the filing of the lawsuit" (*see* Painter, 84 Cornell L Rev at 48, at 47-49, 56-58 [discussing the original versions of HR 1689 and its near mirror image, S 1260, and changes in these bills as approved by each house, adopted by the House-Senate Conference Committee and passed by Congress]).

By adding a single-entity exemption in the final bill to cover legal entities that may act on behalf of numerous beneficiaries, Congress made sure that, in bringing suits in their own names, these entities would be counted as one person, unless they were "established for the purpose of participating in the action" (*see* 15 USC § 77p [f] [2] [C]; § 78bb [f] [5] [D]).

certainly seem that the Trust is an "entit[y] duly authorized by law . . . to seek damages on behalf of another person or entity" (*id.*).

Moreover, chapter 11 plans apparently often call for this type of postconfirmation liquidation vehicle (PCLV) to collect, administer and distribute estate assets after the debtor's plan has been confirmed. Indeed, "[t]he shortening of Chapter 11 timelines" effected by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (Pub L 109-8, 119 US Stat 23 [BAPCPA]) may have "increas[ed] the importance and promi- nence of PCLVs" because they "allow a Chapter 11 debtor to focus preconfirmation on the more pressing needs of its reorga- nization or liquidation while deferring issues regarding illiquid estate assets, causes of action, and claims reconciliation until af- ter confirmation of its plan" (Thau, Friedland and Geekie, *Post- confirmation Liquidation Vehicles [Including Liquidating Trusts and Postconfirmation Estates]: An Overview*, 16 J Bankr L & Prac 2 art 4 [2007]).

Further, liquidating trusts and postconfirmation estates seem to have grown in popularity because of the "post-*Enron/ WorldCom* world of Sarbanes-Oxley" in which we live, "where claims might exist against the debtor's former insiders, ac- countants, financiers, and others" (*id.*). Because this kind of lit- igation is "complicated, expensive, and time-consuming," it "can take years to get to trial and many months to try, not something that fits with BAPCPA's contemplated timeline for plan confirmation" (*id.*). These issues may be resolved

> "by transferring the right to bring these actions (with unsecured and secured creditors even agree- ing to share in recoveries) to a PCLV. Debtor's management is no longer faced with the prospect of suing those with whom they have possibly worked or with the expense and distraction of contentious litigation, and it can devote its energies toward more pressing, internal reorganization efforts and plan confirmation issues. On the other hand, creditors do not face the same concerns or constraints as debtor management, and those creditors faced with little or no cash distribution under the plan[ ] are happy to take a flier on such litigation. By transferring this litigation to a PCLV, debtor management can avoid

unattractive litigation *while creating incentives for plan approval"* (*id.* [emphasis added]).[8]

SLUSA's single-entity exemption was first examined in the bankruptcy context in *Cape Ann Invs. LLC v Lepone* (296 F Supp 2d 4 [D Mass 2003]). There, Cape Ann, an investor syndicate, and other shareholders assigned their claims to a litigation trust created by the bankruptcy court to pursue any potentially recoverable assets of the bankruptcy estate. When the trustee of the litigation trust brought a state court action on the shareholders' behalf against the defunct company's accountants, the accounting firm (Deloitte, as in this case) removed the complaint to the federal district court, and moved to dismiss on the ground of SLUSA preclusion. In response, the trustee moved to remand. There were more than 50 of these shareholders (although Cape Ann itself was acknowledged to be a single entity).

The United States District Court for the District of Massachusetts held that the trust was not "one person" within the meaning of SLUSA's single-entity exemption (296 F Supp 2d at 10). The Judge was principally persuaded that the trust was not "a unitary entity" because "[t]he Trust Agreement describe[d] the primary purpose of the Trust as prosecuting the Causes of Action contributed to it . . . and distributing to the [beneficiaries; i.e., the shareholders] the assets of the Trust remaining after payment of all claims against or assumed by the Trust" (*id.* [internal quotation marks omitted]).

Similarly, in *LaSala v Bank of Cyprus Pub. Co. Ltd.* (510 F Supp 2d 246 [SD NY 2007]), the United States District Court for the Southern District of New York looked to the "primary purpose" of a trust to decide whether it qualified for treatment as "one person" under SLUSA.[9] In this case, a liquidating trust was formed under state law pursuant to three court orders issued in connection with the settlement of a securities fraud

---

**8.** The authors suggest additional reasons why liquidating trusts have grown in popularity in recent years: they (1) maximize value for creditors by increasing the speed of restructuring; (2) are consistent with the growing trend of major section 363 (11 USC § 363) sales and liquidating cases rather than stand-alone reorganizations; (3) provide a potential source of recovery to otherwise out-of-the-money creditors, creating an incentive for them to support the chapter 11 plan; and (4) reduce the expenses of administering the estate by eliminating the redundancy in professional costs.

**9.** The Judge actually dismissed this lawsuit on the basis of forum non conveniens, but nonetheless discussed the alternative ground of SLUSA preclusion in the event the circuit court disagreed (510 F Supp 2d at 267).

class action lawsuit involving AremisSoft, a bankrupt corporation, and its chapter 11 plan of reorganization (*see LaSala v Bordier et Cie*, 452 F Supp 2d 575, 578 [D NJ 2006]). Claims arising out of the purchase or sale of AremisSoft's securities during the relevant time period and all of the company's pre-bankruptcy claims were assigned to this trust.

The Judge concluded, based on various provisions in the trust agreement, that "the [AremisSoft] Trust was formed for the primary purpose of engaging in litigation" on behalf of more than 6,000 beneficiaries, and therefore "the entity exception [did] not apply" (*LaSala*, 510 F Supp 2d at 270). The same court, in another case involving the AremisSoft Trust, distinguished *Smith v Arthur Andersen LLP* (421 F3d 989 [9th Cir 2005]), discussed infra, on the ground that "the prevalence of ordinary bankruptcy-related tasks in the mandate of the trust [in *Smith*] precluded a finding that it was organized for the primary purpose of litigating trust claims" (*LaSala v UBS, AG*, 510 F Supp 2d 213, 237 [SD NY 2007]). The United States District Court for the District of New Jersey—which approved the creation of the AremisSoft Trust in the first place—distinguished that trust from the trust in *Smith* on the basis that the latter

> "did not receive an assignment of claims from a class of shareholders pursuant to a class action settlement as in the instant case and in *Cape Ann*. Instead, the *Smith* trust was formed to be the bankruptcy estate's representative for *all purposes*. Therefore, by the terms of its creation, the [AremisSoft] Trust, like the *Cape Ann* trust, functions more like a shareholder class representative than a traditional bankruptcy trustee, pursuing this litigation on behalf of a class of approximately 6,000 persons" (*LaSala*, 452 F Supp 2d at 584).

In *Smith*, the Ninth Circuit cited the reasoning of the District Court in *Cape Ann* with approval, noting that the *Cape Ann* court's "suggest[ion] that an entity is not one person if its 'primary purpose' is to pursue causes of action" was "sensible" (*Smith*, 421 F3d 1007). Further, a

> "contrary interpretation, under which any entity established 'at least in part' for the purpose of pursuing litigation is not a 'person,' [would be] inconsistent with [SLUSA's] plain language, which

provides that an entity 'shall be treated as one person' if the entity is not 'established for *the* purpose of participating in the action.' Moreover, that interpretation could potentially deprive many bankruptcy trustees of the ability to pursue state-law securities fraud claims on behalf of an estate. Nothing in SLUSA suggests that Congress intended to work such a radical change in the bankruptcy laws" (*id.* at 1007-1008).

The *Smith* court concluded that "pursuing causes of action" was not the trustee's " 'primary' purpose" because

"[t]he Debtor's Plan, under which the Trustee was appointed, provides that the Trustee will 'act as the Estates' representative for *all purposes*, and will be responsible for (i) controlling and managing the consideration received from [the company to which some of the debtor's assets were sold under the bankruptcy plan] and all Retained Assets, (ii) monetizing Retained Assets, (iii) filing, prosecuting and settling claim objections, (iv) administering the disputed claim reserve, (v) prosecuting and settling Estate causes of action, (vi) making distributions in accordance with the terms of the Plan, and (vii) winding-up and closing the Estates" (*id.* at 1008 [internal quotation marks omitted]).

The court held that "[b]ecause the Trustee [was] to 'act as the Estates' representative for all purposes,' and not just for the purpose of pursuing causes of action, the Trustee [was] one person, and the Trustee's Action [was] not a 'single lawsuit' barred by SLUSA" (*id.*). In *Smith*, unlike *Cape Ann* (and *LaSala*), the trustee was not asserting claims assigned to a trust by a debtor's creditors, although this was not the reason given by the court for its decision.

More recently, the Third Circuit examined the single-entity exemption in *LaSala v Bordier et Cie* (519 F3d 121 [3d Cir 2008], *cert dismissed* 555 US 1028 [2008]), an appeal from the District Court's dismissal (discussed earlier) of the state and Swiss law fraud claims brought by the trustees of the Aremis-Soft Trust against two banks. The defendants allegedly assisted the debtor's officers and directors in a "pump and dump" scheme whereby after "pumping" the stock's price by misrepresenting the company's finances, the insiders "dumped" the stock on the market for unsuspecting investors to purchase

at the artificially inflated prices. The court vacated the District Court's order, holding that SLUSA did not preclude the action.

The Third Circuit observed that the trustees were claiming damages "in their capacity as assignees of the true injured parties," and that "the injured party [was], at least in the first instance, AremisSoft," while the banks asserted that the injured parties were, in fact, the "[p]urchasers in their individual capacities as purchasers of securities" (*id.* at 131). "Reading the complaint against the background of Delaware law," the court first concluded that the complaint's aiding-and-abetting claims were "originally owned by AremisSoft, and assigned to the Trust by the AremisSoft bankruptcy estate" (*id.* at 132). Put another way, the claims originally "belonged to AremisSoft, not to the purchasers of AremisSoft stock" (*id.*).

Turning to SLUSA, the Third Circuit then considered that the single-entity exemption, by its wording, directed judges "to follow the usual rule of not looking through an entity to its constituents unless the entity was established for the purpose of bringing the action, *i.e.*, to circumvent SLUSA" (*id.* at 132-133; *see also id.* at 134 ["SLUSA's single exception to this rule is that when (a) corporation is established for the purpose of litigation, *i.e.*, when plaintiffs try to avoid SLUSA by running their securities claims through a corporate entity, the court should look to the corporation's constituents"]). To evaluate the District Court's ruling, the court opined that it was

> "first necessary to recall the nature and ownership of these claims[, which] . . . at one time belonged to AremisSoft, the entity allegedly injured by its Directors' breaches of duty and the Banks' aiding those breaches. In bankruptcy, the claims passed to AremisSoft's bankruptcy estate . . . but the debtor-in-possession did not assert them during the pendency of the bankruptcy. Rather, the bankruptcy estate assigned them to the Trust, a state-law entity created in large part to pursue these and similar claims for the ultimate benefit of the Purchasers, the only group whose interests were impaired by the plan of reorganization. Thus, the Trust can only bring these claims as assignee of the bankruptcy estate" (*id.* at 133).

The court then observed that "[t]hough the parties do not go into detail on this point, one would assume that this deal was

struck so that the Purchasers would vote to approve the plan of reorganization, even though their interests were impaired" (*id.* at 133 n 16).[10]

The Third Circuit concluded that it was, in fact, irrelevant whether the AremisSoft Trust was established for the purpose of litigation; the purchasers were simply the beneficial owners of the claims assigned by the true injured party, AremisSoft, to the AremisSoft Trust. The banks argued that "allowing these claims to go forward [would] re-create a loophole for abusive securities litigation that Congress intended, through SLUSA, to close," to which the court replied that it was difficult to "imagin[e] such assignments occurring outside very special contexts, such as bankruptcy, a context in which Congress clearly intended fiduciary-duty actions to go forward" (*id.* at 142).

Thus, the majority of the federal courts to have considered whether a liquidating trust may press state law fraud claims against a bankrupt corporation's outside counselors and consultants for the benefit of the corporation's creditors have zeroed in on whether the trust's "primary purpose" is litigation of such claims. This was the analytical test applied by Supreme Court to decide that SLUSA does not preclude this action, and we agree with that court that, judged by the language in the Plan and the Trust Agreement, the "primary purpose" of the Trust is far broader than the pursuit of creditors' causes of action.

There are many reasons why a liquidating trust appeals to debtors, creditors and bankruptcy courts. As the Third Circuit noted in *LaSala*, bankruptcy is a "very special context[ ]" where Congress clearly intended to preserve the prerogative of bankruptcy trustees to assert claims of bankruptcy estates (*id.* at 135-136). In short, the Liquidating Trust was not a device created by plaintiffs or their attorneys to circumvent SLUSA, which is what the statutory language precluding unitary status for entities created for "the purpose of participating in the action" was designed to forestall.

The dissent favors the approach taken by the Third Circuit, which did not assess the "primary purpose" of the particular trust at issue. Instead, based on an assessment of the pleadings in light of Delaware law, that court determined that AremisSoft, the bankrupt corporation, was the true "injured party" on

---

**10.** The interests of the senior and subordinated bondholders in this case were, of course, likewise impaired by the Plan.

whose "behalf" the litigation was brought, not the 6,000 purchasers who assigned their claims to the AremisSoft Trust. Indeed, the dissent is certain that the Third Circuit "would have held the present case to be barred by SLUSA" (dissenting op at 418). The facts in *LaSala*, however, are very different from the facts here.

In *LaSala*, the bankruptcy estate assigned the debtor's claims to the purchasers and the purchasers separately assigned these claims (which were originally the debtor's claims) to the AremisSoft Trust. Here, as previously discussed, the Plan transferred the bankruptcy estate's assets, which included the litigation claims of RGH, RFS and their respective general unsecured creditors who did not opt out of the Plan, to the Trust. Under section 541 (a) (7) of the Bankruptcy Code, a bankruptcy estate includes "[a]ny interest in property that the estate acquires after the commencement of the case" (11 USC § 541 [a] [7]; *see In re CBI Holding Co., Inc.*, 529 F3d 432, 457-458 [2d Cir 2008] [discussing the legislative history of section 541 (a) (7)]). In other words, the bondholders' claims were property within the estate, and the Trust brought this action on behalf of the estate for the benefit of the bondholders. Put yet another way, in *LaSala* the creditors (i.e., the purchasers) owned the debtor's (i.e., AremisSoft's) claims and enlisted the AremisSoft Trust to prosecute the debtor's claims for their benefit. Here, the debtor's estate owned the creditors' (i.e., the bondholders') claims and enlisted the Trust to prosecute the estate's claims for their benefit. We assume the Third Circuit would not have even needed to analyze the identity of the true injured party in *LaSala* if the purchasers' claims had been included within a bankruptcy estate, rather than separately assigned by the purchasers to the AremisSoft Trust.

Finally, we have decided in this appeal, involving a pre-answer motion to dismiss, only that SLUSA does not preclude the bondholders' lawsuit against Deloitte and Lommele, which adequately pleaded fraud. We do not opine on any issues related to the merits of these claims. When defendants interpose their answers they are, of course, free to plead any potentially applicable affirmative defense.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs, the order of Supreme Court reinstated, and the certified question answered in the negative.

SMITH, J. (dissenting). More than 50 bondholders of Reliance Group Holdings, Inc. (RGH) assigned claims to The RGH Liquidating Trust, which agreed to distribute to those bondholders the net proceeds resulting from any recovery on those claims. The Trust then brought this action asserting the claims of the bondholders (among others) against Deloitte & Touche and a Deloitte principal under New York law. The Trust alleges that Deloitte, as RGH's auditor, fraudulently caused RGH's financial condition to be misstated, thus inducing the bondholders to buy, or to refrain from selling, RGH bonds. The reason for bringing the case under state law is apparent: a federal securities law claim against Deloitte would have been time-barred (*see Lampf, Pleva, Lipkind, Prupis & Petigrow v Gilbertson*, 501 US 350, 364 [1991]; 28 USC § 1658 [b]).

Congress enacted the Securities Litigation Uniform Standards Act of 1998 (15 USC § 78bb [SLUSA]) to prevent exactly this kind of evasion of federal securities law barriers to suit. The majority nevertheless finds the Trust's action on behalf of the bondholders permissible under SLUSA. It does so through a narrow reading of the statute that is inconsistent with the approach taken to similar questions by the federal courts.

SLUSA says: "No covered class action based upon the statutory or common law of any State . . . may be maintained in any State or Federal court . . . alleging . . . a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security" (15 USC § 78bb [f] [1] [A]). It is undisputed that RGH's bonds are covered securities; the issue here is whether the Trust's lawsuit is a "covered class action." SLUSA defines that term, in relevant part, as:

"any single lawsuit in which—

"(I) damages are sought on behalf of more than 50 persons . . . and questions of law or fact common to those persons . . . , without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons" (15 USC § 78bb [f] [5] [B] [i]).

This is a covered class action if the Trust is seeking damages "on behalf of more than 50 persons." In common sense, of course it is: it is the assignee of more than 50 bondholders, and any damages it recovers will be distributed to those bondholders. Indeed, the Trust's amended complaint says that it is suing

"on behalf of the general unsecured creditors" of RGH, a term that includes the bondholders.

But the Trust argues, and the majority holds, that the action may be treated as though it were brought on behalf of only one person, the Trust, because of the following SLUSA provision, captioned "Counting of certain class members": "For purposes of this paragraph, a corporation, investment company, pension plan, partnership, or other entity, shall be treated as one person . . . but only if the entity is not established for the purpose of participating in the action" (15 USC § 78bb [f] [5] [D]).

Deloitte argues, persuasively it seems to me, that this provision is not relevant to this case, because even if the Trust is "treated as one person" it is still suing "on behalf of" more than 50 others—just as a class representative may be one person, but a class action will still be barred by SLUSA. If the "counting" provision is controlling here, however, that should not change the result.

The counting provision means, as the United States Court of Appeals for the Third Circuit has explained, "that the court is to follow the usual rule of not looking through an entity to its constituents unless the entity was established for the purpose of bringing the action, i.e., to circumvent SLUSA" (*LaSala v Bordier et Cie*, 519 F3d 121, 132-133 [3d Cir 2008]). The record makes clear that bringing actions like this one—and thus circumventing SLUSA—was an important part of the reason for the Trust's creation. That was not, it is true, the Trust's sole purpose. According to the Plan of Reorganization that brought the Trust into existence, it was "established . . . for the purposes of receiving the Trust Property and assuming the Assumed Liabilities, and liquidating and distributing the Trust Property for the benefit of the Trust Beneficiaries." But the bondholders are "Trust Beneficiaries" and the "Trust Property" includes what the Plan calls "Creditor Litigation Claims"— among them the claims that the Trust is now asserting. Indeed, Creditor Litigation Claims, and the resulting proceeds, were viewed as a very significant part of the Trust's assets. The Disclosure Statement prepared in connection with the Plan of Reorganization says: "on the Effective Date, the primary assets of the Liquidating Trust will consist of: (i) Causes of Action, including, but not limited to, the D&O Litigation Proceeds and the Creditor Litigation Proceeds."

In short, bringing lawsuits like this one was one of the major purposes of the Trust. To treat the Trust as a single person

when it is implementing that purpose, and to ignore the obvious fact that it is acting on behalf of more than 50 other persons, simply invites evasion of SLUSA. That, as I view it, is all there is to this case.

The majority reaches another conclusion through what seems to me a confused reading of SLUSA's legislative history. It is true, as the majority says, that the legislative history shows that SLUSA's authors did not want to bar litigation by trustees in bankruptcy and similar entities "duly authorized by law . . . to seek damages on behalf of another person or entity" (S Rep 105-182, at 8 [quoted in majority op at 407]). That is why language in the draft legislation that might have been read to bar an action by a trustee in bankruptcy was deleted. But the majority ignores the difference, critical for SLUSA purposes, between a trustee in bankruptcy—who sues, ordinarily, on behalf of a single entity, the debtor—and a liquidating trust like this one, which is bringing claims assigned to it for the purpose of suit by more than 50 potential plaintiffs. Nothing in either the language or the legislative history of SLUSA suggests that Congress meant to grant an exemption to any "liquidation vehicle" that is doing precisely what SLUSA was enacted to prevent.

The federal cases dealing with this sort of question are consistent with the distinction I have made between the successor in interest to a single entity (e.g. a trustee in bankruptcy) and the assignee of many (e.g. the Trust here). That distinction is explicitly drawn by Judge Pollak's opinion for the Third Circuit in *LaSala*.

*LaSala* was, in a critical way, the mirror image of this case: the claims being litigated there had originally belonged not to many entities, but to one, a bankrupt company called AremisSoft. The claims had passed, as the court explained, "from a corporation to its bankruptcy estate to a trust" (519 F3d at 126). That was the critical fact supporting the Third Circuit's holding that the case was not barred by SLUSA. The court concluded, after a careful analysis, that the claims it was analyzing "originally belonged to AremisSoft, not to the purchasers of AremisSoft stock" (*id.* at 132). If the claims had originally belonged to the purchasers (of whom there were more than 50) the *LaSala* court would have come out differently. Interpreting the words of SLUSA that are critical here—"on behalf of more than 50 persons"—the court explained that that phrase

"seems to refer to someone bringing a claim on behalf of 50 *injured* persons. In other words, the phrase refers to the assignors of a claim, not to the assignee . . . Under this reading, the Trust is not bringing its claims 'on behalf of' the Purchasers, as SLUSA uses the term, because the Purchasers are not the injured parties; rather, the Trust is bringing the claims 'on behalf of' AremisSoft." (*Id.* at 134.)

It is apparent that the *LaSala* court would have held the present case to be barred by SLUSA. Here, it is undisputed that "the assignors" were not a bankrupt corporation, but more than 50 bondholders. It is they, in *LaSala*'s terms, who are the "injured parties," and this action is brought on their "behalf."

The majority takes a contrary view of *LaSala*'s application to this case, based, apparently, on the majority's belief that the claims of the bondholders here were momentarily included in "the bankruptcy estate's assets" (majority op at 414)—i.e., that the claims passed through the estate's hands on their way from the bondholders to the Trust, rather than being directly assigned to the Trust by the bondholders. Even if true, that would be irrelevant under the *LaSala* court's reasoning: it would not alter the fact that the bondholders were the injured parties. But I believe the majority is factually wrong: I see nothing in the record to support the assertion that the RGH bankruptcy estate ever owned these claims. The majority is correct in saying that the assignment of the claims from the bondholders to the Trust was effected in RGH's Plan of Reorganization—but why this purely formal distinction would change the *LaSala* court's analysis is something the majority does not explain.

Other federal cases are consistent with the *LaSala* approach. In *Smith v Arthur Andersen LLP* (421 F3d 989 [9th Cir 2005]), the action was brought by a trustee in bankruptcy, the successor in interest to a single entity, Boston Chicken, Inc. The court held the action not barred by SLUSA, observing that a contrary holding "could potentially deprive many bankruptcy trustees of the ability to pursue state-law securities fraud claims on behalf of an estate" (*id.* at 1008). By contrast, in *Cape Ann Invs. LLC v Lepone* (296 F Supp 2d 4 [D Mass 2003]), the court dismissed under SLUSA claims that had been assigned to a litigation trust by shareholders who claimed they had been induced to purchase, or to refrain from selling, stock in a company that went bankrupt. The trustee, as the court pointed out, had a duty to act "for the benefit of the . . . Shareholders. In that respect, his

role is no different than that of any shareholder class representative" (*id.* at 10).

The *Smith* and *Cape Ann* opinions, like the majority opinion here, speak of the "primary purpose" for which a particular entity is formed. But unlike today's majority, these federal cases address the "primary purpose" question with reference to the particular purpose being carried out in the lawsuit at hand— i.e., they in substance ask whether the lawsuit is an evasion of SLUSA or not. The Third Circuit in *LaSala* adopted what seems to me a more useful interpretation of SLUSA's "established for the purpose of participating in the action" language: "when the corporation is established for the purpose of litigation, *i.e.*, when plaintiffs try to avoid SLUSA by running their securities claims through a corporate entity, the court should look to the corporation's constituents" (519 F3d at 134). Because that is exactly what happened here—the bondholders have tried to avoid SLUSA by running their claims through a liquidation trust—I would affirm the Appellate Division's order dismissing those claims.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, PIGOTT and JONES concur with Judge READ; Judge SMITH dissents and votes to affirm in a separate opinion.

Order, insofar as appealed from, reversed, etc.